## UNITED STATES DISTRICT COURT
## MIDDLE DISTRCT OF TENNESSEE

| | |
|---|---|
| PATRICK DYAR, Individually and on Behalf of All Others Similarly Situated,<br><br><br>Plaintiff,<br><br>v.<br><br>ACADIA HEALTHCARE COMPANY, INC., DEBRA K. OSTEEN, CHRISTOPHER H. HUNTER, DAVID M. DUCKWORTH, and HEATHER DIXON,<br><br><br>Defendants. | **Case No.**<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Patrick Dyar ("Plaintiff"), by and through his counsel, alleges the following upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief are based on, among other things, the independent investigation of counsel. This investigation includes, but is not limited to, a review and analysis of: (i) public filings by Acadia Healthcare Company, Inc. ("Acadia" or the "Company") with the Securities and Exchange Commission ("SEC"); (ii) transcripts of Acadia conferences with investors and analysts; (iii) press releases and media reports issued and disseminated by the Company; (iv) analyst reports concerning Acadia; and (v) other public information and data regarding the Company.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of all persons and entities that purchased or acquired Acadia securities between February 28, 2020 and October 18, 2024, inclusive (the "Class Period"). Plaintiff asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder, against: (i) Acadia; (ii) the Company's Chief Executive Officer ("CEO") Christopher H. Hunter ("Hunter"); (iii) the Company's Chief Financial Officer ("CFO") Heather Dixon ("Dixon"); (iv) the Company's former CEO Debra K. Osteen ("Osteen"); and (v) the Company's former CFO David M. Duckworth ("Duckworth").

2.      Acadia provides behavioral healthcare services in the United States and Puerto Rico. The Company generates the bulk of its revenue from operating acute inpatient psychiatric facilities, which, according to Acadia, provide a high level of care to stabilize patients that are either a threat to themselves or to others.

3.      This case concerns Defendants' misrepresentations regarding the strength and drivers of the Company's demand and patient referrals, its purported close relationships with payer

partners like Medicare, Medicaid, and commercial insurers, as well as the claimed high-level of patient care provided by Acadia's psychiatric facilities.

4.    During the Class Period, Defendant Hunter stated that the Company saw "***record demand***," including increases in revenue per day and patient days, driven by a "de-stigmatization around mental health[.]" Defendant Duckworth stated that the "***key drivers***" of the Company's "strong revenue per day trends" included "rate increases across all of our payers" and a "favorable payer mix." Defendant Hunter likewise touted Acadia's "***very strong partnerships with our payer partners***," providing further assurance as to the sustainability and legitimacy of the Company's revenue base. According to Defendant Osteen, Acadia was "***providing exceptional patient care***," and that the Company has "had very steady referrals from the ERs" because it was "important to the ERs that their patients get to the right place and that they get [the] care" they needed.

5.    In truth, Acadia's business was built on disturbing and unsustainable practices. The Company's "record demand"—including increases in revenue per day and patient days—was driven by defrauding insurers to cover longer patient stays by exaggerating patients' symptoms and altering medical dosages, often holding patients until their coverage ran out. The Company also routinely exploited laws to exceed the legal limits for holding patients against their will—allowing them to continue to charge their insurance—by filing petitions to extend patients' involuntary stays. Further, far from "providing exceptional patient care," the Company detained patients who did not need to be at a facility and provided poor care in filthy conditions. And although the Company touted its "very steady referrals from [] ERs" to get "their patients [] to the right place," it continually pressured its assessors to bring patients to Acadia's facilities, even when against the best interests of patients.

6.  On September 1, 2024, *The New York Times* published an article titled "How a Leading Chain of Psychiatric Hospitals Traps Patients," based on an investigation that included official complaints, court records, and interviews of more than 50 current and former Acadia executives and staff members.  The article revealed, among other things, that: (i) Acadia employed an array of strategies—including exaggerating patients' symptoms and altering medical dosages—to coax insurers to cover longer stays; (ii) Acadia routinely exploited laws to exceed the legal limits for holding patients against their will by filing petitions to extend patients' involuntary stays; (iii) health inspectors have found that Acadia's patients did not receive therapy, were unsupervised, and were denied access to vital medications, with inspection reports describing assaults and filthy conditions; and (iv) Acadia pressured its assessors to bring patients to Acadia's facilities from local emergency rooms, even when against best interests of patients.

7.  On this news, the price of Acadia stock declined roughly 5%, from $81.93 per share on August 30, 2024, to $78.21 per share on September 3, 2024, on unusually high trading volume.

8.  On September 27, 2024, Acadia disclosed that it had "received a voluntary request for information from the United States Attorney's Office for the Southern District of New York" and "a grand jury subpoena from the United States District Court for the Western District of Missouri (W.D.Mo.) related to its admissions, length of stay and billing practices."  The Company also revealed that "Lakeland Hospital Acquisition, LLC, a subsidiary of Acadia, also received a grand jury subpoena from W.D.Mo." regarding similar subject matter.

9.  On this news, the price of Acadia stock fell roughly 16%, from $75.66 per share on September 26, 2024, to $63.28 per share on September 27, 2024, on unusually high trading volume.

10. Then, on October 18, 2024, *The New York Times* published an article titled "Veterans Dept. Investigating Acadia Healthcare for Insurance Fraud," stating that the "Veterans Affairs Department is investigating whether Acadia . . . is defrauding government health insurance programs by holding patients longer than is medically necessary[.]" The article also stated that "[s]everal former Acadia employees in Georgia and Missouri have also recently been interviewed by agents from the F.B.I. and the inspector general's office of the Health and Human Services Department."

11. On this news, the price of Acadia stock fell about 12%, from $59.32 per share on October 17, 2024, to $52.03 per share on October 18, 2024, on unusually high trading volume.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

14. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Acadia's headquarters are located within this District and Defendants conducted substantial economic activity in the District. As such, substantial acts in furtherance of the alleged fraud have occurred in this District.

15. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.     Plaintiff is Patrick Dyar.  Plaintiff purchased Acadia securities during the Class Period, as detailed in the Certification attached hereto and incorporated herein, and has been damaged thereby.

17.     Defendant Acadia is a Delaware corporation with its corporate headquarters and principal place of business in Franklin, Tennessee.  Acadia's common stock trades on the NASDAQ stock exchange under the ticker symbol "ACHC."

18.     Defendant Hunter has served as the CEO of Acadia since April 2022.

19.     Defendant Dixon has served as the CFO of Acadia since July 2023.

20.     Defendant Osteen served as the CEO of Acadia from December 2018 through March 2022.

21.     Defendant Duckworth served as the CFO of Acadia from April 2011 through July 2023.

22.     Defendants Hunter, Dixon, Osteen, and Duckworth are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.

23.     The Individual Defendants were provided with copies of the Company's presentations and SEC filings alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

24.     Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts and omissions specified herein had

not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

25. Acadia provides behavioral healthcare services in the United States and Puerto Rico. The Company operates acute inpatient psychiatric facilities, specialty treatment facilities, comprehensive treatment centers ("CTCs"), and residential treatment centers and facilities. As of June 30, 2024, the Company operated 258 behavioral healthcare facilities in 38 states and Puerto Rico, inclusive of over 50 psychiatric hospitals.

26. The bulk of Acadia's revenue comes from the Company's acute inpatient psychiatric facilities, which, according to the Company, provide a high level of care to stabilize patients that are either a threat to themselves or to others. Acadia states that typical lengths of stay for crisis stabilization and acute care range from three to five days and from five to twelve days, respectively.

27. The Company primarily receives payments for services rendered in its facilities from: (i) state governments under their respective Medicaid and other programs; (ii) commercial insurers; (iii) the federal government under the Medicare program administered by Centers for Medicare and Medicaid Services ("CMS"); and (iv) individual patients and clients. For the year ended December 31, 2023, Acadia received 54% of its revenue from Medicaid, 28% from commercial payors, 15% from Medicare, and 3% from other payors.

**Materially False and Misleading Statements Issued During the Class Period**

28.     The Class Period begins on February 28, 2020.  On that day, Acadia issued its Form 10-K for the fiscal year ended December 31, 2019.  The Company reported that "same facility revenue increased by $106.7 million, or 5.8%," compared to the prior year, "***resulting from same facility growth in patient days of 3.2% and an increase in same facility revenue per day of 2.5%***." The Company stated that the growth in same facility patient days resulted from the "***ongoing demand for our services***."

29.     The Form 10-K provided a description of the Company's "Acute Inpatient Psychiatric Facilities," stating that the "facilities provide ***a high level of care*** in order to stabilize patients that are either a threat to themselves or to others" and that "***[l]engths of stay for crisis stabilization and acute care range from three to five days and from five to twelve days, respectively***."

30.     On March 3, 2020, during the Acadia Healthcare Company, Inc. at Raymond James Institutional Investors Conference, Defendant Osteen discussed the Company's "acute business," stating that the business line has "***had a very stable length of stay . . . about 9 days, and that really has not changed over the last 4 years***."  Defendant Osteen went on to state that the Company had "***consistent high quality across our acute service line***" and touted the acute service line's "***broad base of referrals***" to generate additional revenue.

31.     On April 30, 2021, during the Company's Q1 2021 earnings call, Defendant Osteen stated that the Company has "***continued to meet th[e] critical demand and provide the highest quality care in a safe and accessible manner***."

32.     During the Q&A portion of the call, RBC Capital Markets analyst Frank George Morgan asked regarding the "strong same-store top line growth" stating "when I look at that, it

looks like nice growth in patient days and part of that driven by about 2% growth in length of stay. So I'm just curious, what's driving that increase? And then any color or any breakout on the 4.5% on the pricing side?"

33.     In response, Defendant Duckworth stated that the Company's "strong revenue per day" was a "continuation of a strong trend that we have seen," and specifically attributed it to "*those that manage our payer relationships here at the corporate office [who] are doing a great job on rate increases across our service lines.*" Defendant Duckworth also called out the Company's "*strong payer mix*," noting that the "commercial payer mix did increase slightly," which was "a *contributing factor to our revenue per day growth being at 4.5%.*"

34.     On August 3, 2021, Acadia held its Q2 2021 earnings call. During the call, Defendant Osteen stated that the Company's quarterly results reflected "*increased demand for our behavioral health services* and our continued focus on delivering efficiencies across our operations," stating "*[w]e experienced favorable volume trends while providing exceptional patient care across all of our service lines*."

35.     During the Q&A portion of the earnings call, Deutsche Bank analyst Philip Chickering asked if the Company could "talk about the revenue per day a little more," including "the biggest driver" and "how we should think about revenue per day increasing" over the next couple of years."

36.     Defendant Duckworth responded, stating that the "*key drivers*" of the Company's "strong revenue per day trends" during the quarter were the "rate increases across all of our payers" and "a favorable payer mix where commercial has grown slightly. He went on to state that the Company expected to "continue to provide revenue per day growth," noting that "we do think a lot of the trends that we see and the revenue per day that we see will continue moving forward."

37.     RBC Capital Markets analyst Frank George Morgan asked Defendants Duckworth and Osteen regarding "an update on the state reimbursement side," including "the kind of updates you're seeing [and] any kind of supplemental payments that you may be getting or expect to continue to get?  And – or any changes you expect to see there?"

38.     In response, Defendant Duckworth noted that "***a significant portion of our revenue [] is Medicaid and that's across 40 different states that we're in.***"  He went on to state that the Company "***continue[s] to see at the state level, very positive coverage trends***" and, specifically, that "***the coverage for behavioral health continues to be very strong at the state level.***"

39.     On October 29, 2021, Acadia held its Q3 2021 earnings call.  During the Q&A portion of the call, Credit Suisse AG analyst Albert J. William Rice asked about "what [the Company] was seeing as [it] work[ed] with acute care hospitals," stating "I know they're an important referral source for you, but they also often have site units that compete with you[.]"

40.     In response, Defendant Osteen stated that the Company has "***had very steady referrals from the ERs***" and stated that "***[w]e've been very focused here in the company on responsiveness because we know it's important to the ERs that their patients get to the right place*** and that they get care and they get it in a timely way," which Defendant Osteen stated was "helpful to our ER referrals."

41.     On November 9, 2021, at the Acadia Healthcare Company, Inc. at Credit Suisse Healthcare Conference, Defendant Duckworth stated that the Company was seeing "strong demand" across its service lines.  He went on to state that "***we do think the acute business with the demand that we see there and with more growth opportunities that we see there across the pathways***" will "***continue to see the strongest revenue growth***."

42.     During the conference, Credit Suisse analyst Albert J. William Rice commented, stating "with all this publicity around mental health and behavioral health, it would seem like this is a pretty good time from a reimbursement perspective" and asked the Individual Defendants whether they can "walk us through the different payer classes, Commercial managed care, Medicaid, Medicare. . .  And what you're seeing in terms of reimbursement trends[?]"

43.     In response, Defendant Duckworth stated that "*we have seen [] an ongoing trend where there is better coverage as the demand has increased, there has been better coverage.*" Defendant Duckworth went on to discuss the Company's payers, stating that Medicare was a "significant payer within the acute business" and touted the Company's "long-standing relationships" with commercial insurers.  He also stated that the Company was "fairly diversified across our states and across many different managed Medicaid payers."

44.     On March 1, 2022, Acadia issued its Form 10-K for the fiscal year ended December 31, 2021.  The Company reported that "[s]ame facility revenue increased by $225.6 million, or 10.9%," compared to the prior year, "*resulting from same facility growth in patient days of 4.3% and an increase in same facility revenue per day of 6.3%.*"  The Company stated that the growth in same facility patient days resulted from the "*ongoing demand for our services.*"

45.     On December 7, 2022, Acadia held its Investor Day.  During the conference, Defendant Hunter touted the Company's "*patient-centric approach*"—one of the Company's purported "major areas of differentiation"—stating that the Company has "*increasingly [] made a strategic choice to focus on the higher acuity patients that have the most severe conditions*, think schizophrenia, bipolar disorder, various psychoses, comorbid conditions."  Defendant Hunter stated that "*[t]hese 2% of patients at the top of this pyramid consume 16% of total spend.  So roughly $6,000 per member per year just in behavioral health.*"

-10-

46.     On June 7, 2023, the Individual Defendants participated in the Acadia Healthcare Company, Inc. at Jefferies Healthcare Conference.  During the conference, Jefferies analyst Brian Gil Tanquilut asked Defendant Hunter for his "thoughts on what's going on with Acadia" and "how you feel a year into it."  Defendant Hunter responded, stating "*we just feel great about the trajectory of the business.  We continue to see record demand for all lines of business and have great payer partners*."  Defendant Hunter went on to state that "*[t]here are just so many attractive ways to deploy capital with the demand that we're seeing for our services and [we] feel like we have very strong partnerships with our payer partners[.]*"

47.     Jefferies analyst Brian Gil Tanquilut noted that Defendant Hunter "touched on strong demand" stating "I think there are so many factors that are driving that" and probing Defendant Hunter to "walk through what's driving a lot of that?  And how sustainable do you think that is?"

48.     In response, Defendant Hunter stated "*[y]es, I think it is sustainable*," noting that "*[t]he demand side of the equation continues to be really strong*."  He went on to discuss the "*multiple things that are behind that*," stating "*[y]ou're also seeing coming out of COVID, kind of a de-stigmatization around mental health and more people that are willing to access services.*"

49.     On July 28, 2023, Acadia held its Q2 2023 earnings call.  During the Q&A portion of the call, UBS Investment Bank analyst Andrew Mok probed the Individual Defendants to "better understand the strengthening trends that you're seeing and that prompted you to raise the outlook for the back half of the year?"

50.     In response, Defendant Dixon stated that the Company's confidence was driven by "*volume trends, reflecting strong demand, occupancy rates and capacity additions*" as well as "*improved visibility into the back half of the year for our revenue per day.*"

-11-

51.     On September 6, 2023, during the Acadia Healthcare Company, Inc. at Wells Fargo Healthcare Conference, Wells Fargo Securities analyst Stephen C. Baxter asked Defendant Hunter "what's changed in the business as you've . . . gone through COVID and come out of it" and "what opportunities does it create for the company across [] different service lines?"

52.     Defendant Hunter responded in pertinent part, stating "*we continue to see record demand for all 4 lines of business and we don't see that dissipating anytime soon.*"  He went on to state that "*we're just seeing really strong volume, really strong demand and interest and just don't see that tapering.*"

53.     On February 28, 2024, Acadia issued its Form 10-K for the fiscal year ended December 31, 2023.  The Company reported that "[s]ame facility revenue increased by $309.3 million, or 12.0%," compared to the prior year, "*resulting from same facility growth in patient days of 5.1%, an increase in same facility revenue per patient day of 6.5% and an increase in same facility admissions of 4.9%.*"  The Company stated that the growth in same facility patient days resulted from the "*ongoing demand for our services.*"

54.     The statements referenced in ¶¶28-31, 33-34, 36, 38, 40-41, 43-46, 48, 50, 52-53 were materially false and misleading.  In truth, the Company's "record demand" and "key drivers" of important financial metrics—including claimed increases in revenue, revenue per day and patient days—were driven by defrauding insurers to cover longer patient stays by exaggerating patients' symptoms and altering medical dosages, often holding patients until their coverage ran out.  The Company also routinely exploited laws to exceed the legal limits for holding patients against their will—allowing them to continue to charge their insurance—by filing petitions to extend patients' involuntary stays.  Further, far from "providing exceptional patient care," the Company detained patients who did not need to be at a facility and provided poor care in filthy

conditions. What's more, although the Company touted its "very steady referrals from [] ERs" to get "their patients [] to the right place," it continually pressured its assessors to bring patients to Acadia's facilities, even when against the best interests of patients.

**The Truth Is Revealed**

55.     On September 1, 2024, *The New York Times* published an article titled "How a Leading Chain of Psychiatric Hospitals Traps Patients." The article—the product of a *New York Times* investigation that resulted from official complaints, court records, and interviews of more than 50 current and former Acadia executives and staff members—stated that part of Acadia's post-COVID success "***was built on a disturbing practice:***" that "***Acadia has lured patients into its facilities and held them against their will, even when detaining them was not medically necessary***."

56.     According to the article: (i) Acadia employed an array of strategies—including exaggerating patients' symptoms and altering medical dosages—to coax insurers to cover longer stays; (ii) Acadia exploited laws to exceed the legal limits for holding patients against their will by filing petitions to extend patients' involuntary stays—only about 1% of which were ultimately granted; (iii) health inspectors have found that Acadia's patients did not receive therapy, were unsupervised, and were denied access to vital medications, with inspection reports describing assaults and filthy conditions; and (iv) Acadia pressured its assessors to bring patients to Acadia's facilities from local emergency rooms, even when against best interests of patients.

57.     More specifically, the article reported that: "[i]n at least 12 of the 19 states where Acadia operates psychiatric hospitals, ***dozens of patients, employees and police officers have alerted the authorities that the company was detaining people in ways that violated the law***," and that "[i]n some cases, judges have intervened to force Acadia to release patients." "At Acadia

-13-

facilities around the country, health inspectors have found that some patients did not receive therapy, were unsupervised or were denied access to vital medications. Many inspection reports described rapes, assaults and filthy conditions."

58.     What's more, the article further stated that "at Acadia, patients were often held for financial reasons rather than medical ones" and that the Company "deploys an array of strategies to persuade insurers to cover longer stays" including exaggerating patients' symptoms and tweaking medication dosages, then claiming "patients needed to stay longer because of the adjustment." Acadia has also "argued that patients are not well enough to leave because they did not finish a meal. Unless the patients or their families hire lawyers, Acadia often holds them until their insurance runs out." The article quoted Lexie Reid, a psychiatric nurse who worked at an Acadia facility in Florida from 2021 to 2022, who stated "[w]e were keeping people who didn't need to be there[.]"

59.     *The New York Times*'s article also discussed how Acadia dispatched "assessors" to overwhelmed E.R.s to help the E.R.s determine whether patients need to be hospitalized. Although the assessors are supposed to be objective, "several said Acadia scolded them when they suggested that patients be sent to other psychiatric hospitals." The article quoted LeDesha Haynes, a former human resources director at Lakeview Behavioral Health Hospital, an Acadia facility in Georgia, who said that when the hospital had empty beds, "the assessors were always being pressured and told to beat the bushes."

60.     *The New York Times* further reported on September 1, 2024, that "[o]nce Acadia gets patients in the door, it often tries to hold them until their insurance runs out. Acadia goes to great lengths to convince insurers that the patients should stay as long as possible[.]" To do that, "[f]ormer Acadia executives and staff in 10 states said employees were coached to use certain

buzzwords, like 'combative,' in patients' charts to make that case." According to "dozens of former Acadia executives, psychiatrists and other staff members" interviewed by *The New York Times*, "[o]nce Acadia won more insurance days for patients, it often would not release them before their insurance ran out[.]"

61.     The article also revealed that Acadia routinely exploited the 72-hour limit for holding patients against their will by filing "more than 4,500 petitions to extend patients' involuntary stays" from 2019 to 2023. "Simply filing a petition allowed the hospital to legally hold the patients — and bill their insurance — until the court date, which can be several days after the petition is filed." Judges, however, granted only 54 of Acadia's petitions, or "***about 1 percent of the total***."

62.     As a result of this news, Acadia's stock price declined roughly 5% on the first trading day after the article was published, falling from $81.93 per share on August 30, 2024, to $78.21 per share on September 3, 2024, on unusually high trading volume.

63.     On September 27, 2024, Acadia disclosed that it had "received a voluntary request for information from the United States Attorney's Office for the Southern District of New York as well as a grand jury subpoena from the United States District Court for the Western District of Missouri (W.D.Mo.) related to its admissions, length of stay and billing practices."

64.     The Company also revealed that "Lakeland Hospital Acquisition, LLC, a subsidiary of Acadia, also received a grand jury subpoena from W.D.Mo." regarding similar subject matter. In addition, Acadia stated that it "anticipates receiving similar document requests from the U.S. Securities and Exchange Commission and may receive additional document requests from other governmental agencies."

65. As a result of this news, Acadia's stock price declined from $75.66 per share on September 26, 2024, to $63.28 per share on September 27, 2024, roughly 16%, on unusually high trading volume.

66. Then, on October 18, 2024, *The New York Times* published an article titled "Veterans Dept. Investigating Acadia Healthcare for Insurance Fraud." The article stated that the "Veterans Affairs Department is investigating whether Acadia . . . is defrauding government health insurance programs by holding patients longer than is medically necessary[.]" "The veterans agency is looking into whether Acadia billed insurance programs for patients who were stable enough to be released and did not need intensive inpatient care[.]" The article also stated that "[s]everal former Acadia employees in Georgia and Missouri have also recently been interviewed by agents from the F.B.I. and the inspector general's office of the Health and Human Services Department."

67. As a result of this news, Acadia's stock price declined from $59.32 per share on October 17, 2024, to $52.03 per share on October 18, 2024, about 12%, on unusually high trading volume.

## LOSS CAUSATION

68. During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. This artificially inflated the price of Acadia securities and operated as a fraud or deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on September 1, 2024, September 27, 2024, and October 18, 2024, as alleged herein, the price of Acadia securities fell precipitously, as the prior artificial inflation came out of the price.

As a result of their purchases of Acadia securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## SCIENTER ALLEGATIONS

69.     As alleged herein, Defendants acted with scienter because Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Acadia, their control over, and/or receipt and/or modification of Acadia's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Acadia, participated in the fraudulent scheme alleged herein.

## CLASS ACTION ALLEGATIONS

70.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Acadia securities during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Acadia and their families and affiliates.

71.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of February 28, 2024, there were 92 million shares of Acadia's common stock outstanding.

72.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.  Whether Defendants violated the Exchange Act;

B.  Whether Defendants omitted and/or misrepresented material facts;

C.  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.  Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

E.  Whether the price of Acadia's securities was artificially inflated;

F.  Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.  The extent of damage sustained by Class members and the appropriate measure of damages.

73.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

74.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

75.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

76.     Acadia's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective and inapplicable and cannot shield the statements at issue from liability.  The statements alleged to be false and misleading above relate to then-existing facts and conditions.

77.     To the extent there were any forward-looking statements, they were not sufficiently identified as such at the time they were made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

78.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was made by or authorized and/or approved by an executive officer of Acadia who knew that the statement was false.

## PRESUMPTION OF RELIANCE

79.     At all relevant times, the market for Acadia's securities was an efficient market for the following reasons, among others:

    A. The Company's shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

    B. As a regulated issuer, Acadia filed periodic public reports with the SEC;

    C. Acadia regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-

-19-

ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.  Acadia was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

80.  As a result of the foregoing, the market for Acadia securities promptly digested current information regarding Acadia from all publicly available sources and reflected such information in the price.  Under these circumstances, all purchasers of Acadia securities during the Class Period suffered similar injury through their purchase of Acadia securities at artificially inflated prices and the presumption of reliance applies.

81.  A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

82.  Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

83.  During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Acadia securities at artificially inflated prices.

84.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Acadia securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

85.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Acadia's business and revenue prospects, as specified herein.

86.    During the Class Period, Defendants made the false statements specified above which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

87.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal the truth about the Company's business and revenue prospects, as specified herein, from the investing public and to support the artificially inflated prices of the Company's securities.

88.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Acadia's securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been

aware that the market prices had been artificially inflated by Defendants' fraudulent course of conduct.

89.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

90.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against The Individual Defendants**

91.     Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

92.     The Individual Defendants acted as controlling persons of Acadia within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Acadia, the Individual Defendants had the power and ability to control the actions of Acadia and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

93.     **WHEREFORE**, Plaintiff prays for judgment as follows:

    A.  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.  Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.  Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## **JURY DEMAND**

94.  Plaintiff demands a jury trial.

Dated: October 29, 2024

Respectfully submitted,

**STRANCH, JENNINGS & GARVEY, PLLC**

*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV, Esq. (BPR # 23045)
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
gstranch@stranchlaw.com

**BLEICHMAR FONTI & AULD LLP**
Javier Bleichmar (*pro hac vice* forthcoming)
300 Park Avenue, Suite 1301
New York, New York 10022
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com

-and-

Ross Shikowitz (*pro hac vice* forthcoming)
75 Virginia Road
White Plains, New York 10603

-23-

Telephone: (914) 265-2991
Facsimile: (212) 205-3960
rshikowitz@bfalaw.com

-and-

Adam C. McCall (*pro hac vice* forthcoming)
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone: (415) 445-4003
Facsimile: (212) 205-3960
amccall@bfalaw.com

*Counsel for Plaintiff Patrick Dyar*